**Opinion issued December 10, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00921-CR

———————————

**RONNIE ANTHONY BRYANT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1338550**

---

## MEMORANDUM OPINION

A jury convicted appellant Ronnie Anthony Bryant of aggravated assault of

a family member and found that he committed the offense using a deadly weapon,

which was not a firearm. *See* TEX. PENAL CODE ANN. § 22.02(a) (West Supp.

2013). Bryant pleaded true to the enhancement allegation that he had previously been convicted of the felony offense of possession of a firearm, and the trial court assessed punishment of 12 years in prison. In a single appellate issue, Bryant contends that the evidence was legally insufficient to support the jury's finding that the ceramic plate used in the commission of the offense was a deadly weapon. We affirm.

## Background

Carol Pitts married Ronnie Bryant on Valentine's Day 2012. Bryant suspected Pitts was having an affair, though she denied it. Two weeks after their wedding, they were sitting in bed, watching television, and eating dinner off of trays. Pitts testified that Bryant was talking on the phone and then things "took a . . . bizarre turn." She said, "[I]t went from 'Hi, Honey,' to really bizarre in like three minutes." Bryant told her, "I'm going to love you the way you love me," but Pitts did not immediately understand what he meant. He came around to her side of the bed and grabbed her plate. As she put her arm up to block her face, he hit her arm with the plate, causing the plate to break. Her arm was lacerated, and she began bleeding heavily.

At trial, the prosecutor asked Pitts where Bryant was aiming when he assaulted her:

Q.     Where on your body was he aiming with the plate?

2

A.     I don't know where he was aiming, but it hit my arm.

Q.     Where was your arm?  Was it laying down or was it up?

A.     Just a defense mechanism.  When he picked it up, I did this (demonstrating).

Q.     So your arm is blocking your face; is that right, for the record?

A.     Uh-huh.

Q.     We have to say "yes" or "no."  I'm sorry, Ms. Pitts, I should have told you that.  So you were blocking your face with your arm.  Which arm was it?

A.     This arm (indicating).

Q.     Your right one?

. . . .

A.     Yes.

. . . .

Q.     You were blocking your face with your right arm.  What did—did he have one hand or two hands on your plate?

A.     Just one.

Q.     Show with a motion with your hand the way the defendant slammed the plate on you.

A.     It came down like this and broke on my arm (demonstrating).

Q.     So did he hit it in a motion that ended up hitting your arm, or did he throw it somewhere else, or did he aim at you?

A.     He aimed at me.

3

Pitts testified that Bryant then took a piece of the broken plate and motioned "like he was going to stab me with it." Moments later, Bryant left the room, returned with knife, and again made stabbing motions. Pitts testified, "I thought he was going to stab me with it." At that time, she was lying on the bed, bleeding profusely, keeping her feet on Bryant's chest to keep him away. Pitts managed to get away from him, examine her wounds in the bathroom, and change her blood-soaked clothing. She went outside, sat on the steps near her apartment, and called 9-1-1 due to the excessive bleeding. At trial she testified that she called 9-1-1 because she "didn't want to die."

Within ten minutes of her phone call, Harris County Sheriff's Deputy F. Salizar, Jr. arrived to find her sitting on the steps with her arm wrapped in a blood-soaked towel and her hands covered in blood. Salizar said it looked like there was one big cut on her arm but "[i]t could have been more." He testified that she was crying, "very distraught," "very upset," and "in a state of shock." Pitts told Salizar that Bryant assaulted her and cut her with a ceramic plate. She also told him that Bryant "just took off running down the street" when he saw the sheriff approaching.

After making sure that Bryant was not inside the couple's apartment, Salizar joined the search for him. Approximately 15 minutes after speaking to Pitts, Salizar found Bryant crouched behind a minivan parked in a nearby residential

4

area.  After identifying himself, Bryant said, "I wasn't doing nothing.  What are you stopping me for?"  He was placed into a patrol car and taken to the apartment, where Pitts identified him before being taken by ambulance to the emergency room.

Pitts spent three days in the hospital, where she underwent orthopedic surgery.  She had three cuts on her arm, two of which went all the way down to the bone.  She also suffered joint damage.

Bryant was charged with aggravated assault on a family member.  The indictment alleged that Bryant caused bodily injury to Pitts, a member of his family and household, by cutting her with a plate, and that he "used and exhibited a deadly weapon, namely a PLATE, during the commission of the offense."

The jury found Bryant guilty of aggravated assault as charged in the indictment.  The trial court assessed punishment, and Bryant timely appealed.

## Analysis

In his sole issue, Bryant argues that the evidence was legally insufficient to support the jury's finding that the plate was a deadly weapon.  He argues that the plate itself was not a deadly weapon and it was only after the plate broke that it became capable of causing more than "some blunt force trauma."

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of

5

fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Under the Texas Penal Code, a person commits aggravated assault if he "uses or exhibits a deadly weapon during the commission of [an] assault." Tex. Penal Code Ann. § 22.02(a)(2) (West Supp. 2013). "A weapon can be deadly by design or use." *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (citing Tex. Penal Code Ann. § 1.07(a)(17) (West Supp. 2013). A ceramic plate is not a deadly weapon by design. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A). But an object may become a deadly weapon if "in the manner of its use" it "is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that

causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). The State must prove only that in the manner of use the object was capable of causing death or serious bodily injury; it need not show that the object caused death or serious bodily injury. *See Tucker*, 274 S.W.3d at 691–92; *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). The statute "does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *McCain*, 22 S.W.3d at 503.

Neither expert testimony nor a description of the weapon is required proof in every case because "the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used." *Tucker*, 274 S.W.3d at 691–92. In *Morales v. State*, 633 S.W.2d 866 (Tex. Crim. App. [Panel Op.] 1982), the defendant was convicted of aggravated assault for cutting the complainant across her face. 633 S.W.2d at 867. The complainant testified that she really did not see the object used to cut her; she said "that she just saw something shiny." *Id.* at 867–68. Another witness testified that she saw a knife, but she could offer no details about the size and shape of the knife. *Id.* at 868. In concluding that the knife used to cut the complainant was a deadly weapon, the Court of Criminal Appeals observed:

7

The manner of the weapon's use is not so elusive, however. The photograph of the wound suffered by complainant shows a deep slash from just underneath the complainant's earlobe across her cheek to the corner of her mouth. The wound appears to be deep and has been closed by numerous sutures.

Throughout its length, the wound is in close proximity to the complainant's throat, starting approximately one to two inches above the jawline and roughly parallel to it.

Although we cannot ascribe to common knowledge medical knowledge such as the position and function of the jugular vein and carotid artery, it is certainly common knowledge that the throat is a particularly vulnerable part of the body, as exemplified by the popular expression 'go for the throat.'

*Id.*

In *Harper v. State*, 753 S.W.2d 516 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd), the defendant was convicted of aggravated robbery when he invaded the complainant's home and forced her to write him a check. 753 S.W.2d at 517. The evidence showed that the complainant lost consciousness and awoke on the bathroom floor with a bloody head and surrounded by broken glass along with the stopper and the broken neck of a decanter. *Id.* at 517–18. The indictment alleged that Harper used a cord, a knife, and a decanter as deadly weapons in the commission of the crime. *Id.* at 517. On appeal, Harper challenged the finding that the decanter was a deadly weapon. *Id.* at 517–18. The court of appeals noted that the complainant was hospitalized for several days due to her injuries. *Id.* at 518. Because fragments of the decanter were found in the bathroom, the court

8

concluded, "It was reasonable for the jury to conclude from the cut on [the complainant's] head and the broken glass that [Harper] struck her with the decanter. It was also reasonable for the jury to conclude that a glass decanter, when used in such a manner, was a deadly weapon." *Id.*

In this case Pitts testified that she had raised her arm to shield her face when Bryant hit her with a ceramic plate using sufficient force to damage her joint and break the plate. In addition, Pitts sustained three lacerations to her arm. Photographs of her injury, the blood-soaked towel, and pools of blood inside and outside her apartment were admitted into evidence at trial. Pitts testified that she spent three days in the hospital and underwent orthopedic surgery as a result of her injuries, and hospital medical records were admitted into evidence at trial. A rational trier of fact could have found beyond a reasonable doubt that the ceramic plate, used in the manner in which Bryant used it on Pitts, was capable of causing "permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ," as, for example, if it had struck Pitts on the face or eye. TEX. PENAL CODE ANN. § 1.07(a)(46); *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Vodochodsky*, 158 S.W.3d at 509; *see also Harper*, 753 S.W.2d at 518–19. We hold that the evidence was legally sufficient to support the jury's verdict as to the deadly weapon finding. We overrule Bryant's sole issue.

9

**Conclusion**

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).